IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY W. CHAPPELL, as Administrator of the Estate of Wendy Chappell Price, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:17-cv-370-GMB |
| ADAM EZEKIEL, *et al.*, | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jerry W. Chappell filed this suit against Defendants Adam Ezekiel, Jessica Mims, and Jason Reeves asserting claims of Excessive Force in Violation of the Fourth Amendment and Wrongful Death. Doc. 1. This lawsuit arises from the fatal shooting of Wendy Chappell Price on June 17, 2015. Now before the court are the Motions for Summary Judgment filed by Defendants Adam Ezekiel (Doc. 77) and Jessica Mims and Jason Reeves (Doc. 78). Also pending before the court is a Motion to Exclude Testimony of Plaintiff's Expert. Doc. 82. After careful consideration of the parties' submissions, the applicable law, and the record as a whole, the court concludes that the Motions for Summary Judgment (Docs. 77 & 78) are due to be GRANTED, and that the Motion to Exclude Testimony (Doc. 82) is due to be DENIED.

## I. JURISDICTION AND VENUE

The court has subject-matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1367. The parties do not contest personal jurisdiction or venue, and

the court finds adequate allegations to support both.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The purpose of summary judgement is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is

"merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

### III.  FACTUAL AND PROCEDURAL BACKGROUND

Resolving all factual inferences in favor of Chappell, the nonmovant, the facts are as follows.

On the night of June 17, 2015, Alabama State Trooper Christopher Nunn was working the construction zone detail at Exit 238 on the southbound side of Interstate 65 in Alabaster, Alabama when a man ran up to him and said, "My wife's crazy. She's got a

gun and threatened to kill me." Doc. 79-5 at 4–5.  Nunn jumped out his patrol car, and asked the man to repeat himself. Doc. 79-5 at 5.  "She's crazy.  She's got a gun.  She's threatened to kill me." Doc. 79-5 at 5.  The man pointed his wife's car out, a reddish Chevy Blazer, which was stuck in heavy traffic. Doc. 79-5.  Nunn drove his patrol car behind her, activated his blue lights and siren, and attempted to pull her over. Doc. 79-5.  Jon Brummitt, another state trooper working the construction zone, followed behind Nunn in his own vehicle. Doc. 79-5 at 6.  Although they were driving slowly, the woman refused to stop until the group had traveled approximately ten miles. Doc. 79-5 at 5–6.

While following the woman, Nunn explained on his radio that someone had told him that his wife was trying to kill him, and that Nunn was behind her vehicle, trying to get it stopped. Doc. 79-5 at 6.  When the woman, Wendy Chappell Price, reached Exit 228, she stopped her car in middle of the interstate under the overpass. Doc. 79-5 at 6.  She did not pull her car onto the shoulder or off the road, but remained in the right lane of traffic. Doc. 79-1.  Other units from the Calera Police Department arrived to assist the troopers and blocked northbound traffic and the southbound on-ramp. Doc. 79-5 at 6.  At least five police cars were present. Doc. 79-1.  The cars were parked behind Price's Chevy Blazer with their lights and sirens activated. Doc. 79-1.  A number of officers exited their vehicles and stood around Price's car. Doc. 79-1.

Nunn used his public address system to give Price commands, instructing her to roll down her window and show her hands. Doc. 79-5 at 7.  Price rolled her window down slightly, but she refused to open her door or roll the window down completely. Doc. 79-1 at 15:32.  Nunn could hear that she was yelling, but he could not make out what she was

saying.[1]  Price blew her horn repeatedly, and for an extended duration, during the stop at

Exit 228. Doc. 79-1.  She also yelled continually. Doc. 79-1.  At one point, Brummitt began

to walk towards her vehicle from behind. Doc. 79-1 at 16:36.  She then flashed her revolver

at him. Doc 79-1 at 16:50.  Brummitt called out, "Whoa, she's got a gun," and "She flashed

her revolver at me." Doc. 79-1 at 16:50–17:03.  Nunn did not personally see the weapon,

but he heard Brummitt's statements and told dispatch that Brummitt had seen the weapon.

Doc. 79-1 at 16:50–17:04.  Price remained in her vehicle for another 18 minutes. Doc. 79-

1.  She continued to yell and blow her car horn. Doc. 79-1.  Then, without warning, she

drove off again. Doc. 79-1 at 35:10.  In total, Price was stopped at Exit 228 for over 30

minutes. Doc. 79-1 at 2:04–35:10.

After Price drove off, law enforcement followed behind her at a speed of around 90

miles per hour. Doc. 79-5 at 7.  Brummitt drove ahead of Price and deployed spike strips

in an effort to stop Price's car. Docs. 79-4 at 11 & 79-5 at 8.  At least one of Price's tires

was punctured by the spike strips, but she continued to drive around 80 miles per hour.

Doc. 79-5 at 8.  Eventually her speed decreased to about 50 miles per hour. Doc. 79-1 at

44:41.  As the group approached a rest stop at Exit 219, one of her tires blew out. Doc. 79-

1 at 45:57.  She continued to drive until she reached Exit 212. Doc. 79-1 at 47:25.

Individual accounts of the car chase follow.

During the high-speed pursuit, dispatch contacted Jessica Mims of the Chilton

County Sherriff's Department and requested that she help to stop traffic because a woman

---

[1] Video evidence reveals that Price was screaming, at least in part, that the Alabaster police were trying to kill her. Doc. 79-1.

was barricaded in her car at Exit 228. Doc. 79-3 at 7. Dispatch also told Mims that they needed a negotiator. Doc. 79-3 at 7. Mims drove to the county line and blocked traffic on the interstate. Doc. 79-3 at 7. After about 15 minutes, she deployed her tire spikes across the southbound lanes of travel on I-65. Doc. 79-3 at 8. Mims saw the Chevy Blazer drive by her followed by law enforcement vehicles. Doc. 79-3 at 8. The spikes did not stop Price's vehicle, so Mims picked them up, put them back in her car, and joined the pursuit. Doc. 79-3 at 8.

Meanwhile, Alabama State Trooper Adam Ezekiel was headed home from Clanton, Alabama and, as he usually does, he took Exit 228 off the northbound lanes of Interstate 65. Doc. 79-4 at 7. He noticed several police cars stationed underneath the interstate overpass, and stopped to ask if he could assist. Doc. 79-9 at 8. A Calera police officer informed Ezekiel that a state trooper had been involved in a chase with an armed woman. Doc. 79-4 at 8. Ezekiel notified dispatch that he would be assisting at the scene, grabbed his patrol rifle, and took a position on the overpass. Doc. 79-4 at 8. It was dark outside, but a police spotlight lit the scene. Doc. 79-4 at 9. Ezekiel could see an SUV underneath the overpass, and he claims that he saw a woman stick her arm out of the SUV's window several times while holding a firearm. Doc. 79-4 at 9. He also heard her blow the car horn repeatedly. Doc. 79-4 at 9. Ezekiel could not see inside the vehicle. Doc. 79-4 at 9. After he had been on the scene for eight to ten minutes, the woman put her car back in gear, steered around a set of spike strips, and drove away. Doc. 79-4 at 10. Ezekiel then joined in the pursuit. Doc. 79-4 at 11. As Ezekiel approached Exit 212, his rear tires were hit by spike strips.

Earlier that day, Jason Reeves of the Chilton County Sheriff's Department was at the local courthouse working on reports and catching calls. Doc. 79-2 at 6. He could hear radio traffic, and overheard that Mims had driven to Exit 228 to put out spike strips. Doc. 79-2 at 6. He then heard that the female suspect was mobile again and possibly had two guns. Doc. 79-2 at 6. When he heard that the group had passed the county line, he thought the suspect might get off the interstate at Exit 219. Doc. 79-2 at 6. He told dispatch that he was going to see if he could help, then got in his car and drove to the rest area near Exit 219. Doc. 79-2 at 7. Price passed by in her vehicle with a pack of law enforcement officers behind her. Doc. 79-2 at 7. Reeves pulled behind the cars and joined in the chase. Doc. 79-2 at 7. As the caravan got closer to Exit 212, the officers from Calera moved out of the way, and Reeves moved up to the front of the pack. Doc. 79-2 at 7.

While the vehicle pursuit was ongoing, City of Clanton Officer Derrick Bone was at the Peach Park in Clanton, near Exit 205, completing a report. Doc. 79-6 at 4. He overheard radio traffic about a vehicle pursuit. Doc. 79-6 at 4. Bone decided to drive to Exit 212 once he heard that the caravan had passed Exit 214. Doc. 79-6 at 4–5. He sat and waited at Exit 212 until he heard over the radio that the group was exiting the interstate. Doc. 79-6 at 5. He then drove backwards down the southbound exit ramp. Doc. 79-6 at 6. Price's car came up the ramp toward him at a slow pace and finally stopped. Doc. 79-6 at 16. The other officers stopped behind her and began to exit their cars. Doc. 79-1 at 48:03. Bone drove his car forwards until his front bumper met with the front bumper of Price's car. Doc. 79-1 at 48:04.

Within seven seconds of stopping their vehicles at Exit 212, law enforcement

swarmed the Chevy Blazer. Doc. 79-1 at 48:10. The front of Price's car smoked. Doc. 79-1 at 48:10. Fourteen seconds after stopping at the exit, an officer standing near the driver's door yelled "She's got a gun!" and quickly retreated from the vehicle. Doc. 79-1 at 48:17. The other officers standing around the car immediately followed suit and ran away from the vehicle. Doc. 79-1 at 48:18. One second later, an officer began to fire his gun into the Chevy Blazer. Doc. 79-1 at 48:19. About six seconds later, the last shots on the scene were fired. Doc. 79-1 at 48:26. A member of law enforcement can be heard remarking that Price fired her weapon. Doc. 49:45. Individual accounts of the shooting follow.

When Bone stopped his car nose to nose with the Blazer, he was not aware that Price had any weapons in her vehicle. Doc. 79-6 at 16. Bone's headlights were on, but he could not see Price well because of the smoke coming from her vehicle. Doc. 79-6 at 7. He immediately approached her vehicle, and ordered her to show her hands. Doc. 79-6 at 6. Bone saw Price throw her right hand up. Doc. 79-6 at 6. He could tell that she was talking, but he could not understand what she was saying due to the sirens and noise. Doc. 79-6 at 6. He saw her wave her right hand around. Doc. 79-6 at 6. When asked whether Price had anything in her right hand, he replied, "Not that I could tell." Doc. 79-6 at 6. Bone never saw Price's left hand. Doc. 79-6 at 6. As Bone was giving commands to Price, he heard the officers near the driver's side door yell, "Gun!" Doc. 79-6 at 7. As he turned to look at the officer, shots started firing. Doc. 79-6 at 7. He immediately ran towards the back of his car. Doc. 79-6 at 7.

As Bone walked to the hood of Price's vehicle, Reeves also approached the vehicle with his weapon drawn. Doc. 79-2 at 9. He instructed Price to show her hands, but he did

not have a bullhorn or any other way to amplify his voice. Doc. 79-2 at 9. There was a dark tint on the vehicle's windows, but Reeves could see that Price's hands were between her legs. Doc. 79-2 at 9. Reeves could not see anything from her wrist down. Doc. 79-2 at 9. Price never complied with the officers' commands to show her hands. Doc. 79-2 at 9. Reeves attempted to open the car door, but it was locked. Doc. 79-2 at 9. Price did not do anything in response. Doc. 79-2 at 9. Reeves then broke the window with his hand, and began reaching inside the car to unlock the door, when he saw the revolver in Price's hands. Doc. 79-2 at 9–10. He began yelling, "Gun!" and he claims that Price pointed the weapon at him. Doc. 79-2 at 10.

Chappell disputes that Price pointed the gun at Reeves. In his interrogatories, Reeves claimed that Price pointed the gun towards him and towards the back of the vehicle. Docs. 89 at 17, 89-6 at 5 & 79-2 at 15. However, in his deposition, Reeves said that he never saw Price point the gun towards the back side of the vehicle. Doc. 79-2 at 15. Chappell also points out that Reeves told the State Bureau of Investigation on June 25, 2015 that he was one hundred percent sure that he saw Price discharge her firearm towards the rear passenger window. Docs. 89 at 17 & 89-1 at 50–51. Lastly, Chappell challenges this fact by noting the testimony of Ezekiel, who stated that he saw Price point the gun upwards. Doc. 79-4 at 13.

Both parties agree that Reeves began to retreat after yelling, "Gun!" Doc. 79-2 at 10. In fact, officers were running in every direction. Doc. 79-2 at 10. As Reeves looked back over his shoulder, he heard gun fire and saw what appeared to him to be a muzzle flash in the vehicle. Doc. 79-2 at 10. Reeves moved back towards the front of the vehicle

and began shooting. Doc. 79-2 at 11. He emptied his magazine. Doc. 79-2 at 11.

When Ezekiel arrived on the scene, he parked on the east side of the southbound off-ramp. Doc. 79-4 at 13. He exited his vehicle, holding his gun at his side. Doc. 79-4 at 13. He watched an officer try to open Price's driver's door. Doc. 79-4 at 13. The door did not open, and 13 seconds after Price stopped her car, the officer broke her window. Docs. 79-4 at 13 & Doc. 79-1 at 48:16. After the window shattered, Ezekiel heard the officer yell "gun," saw him retreat, and saw that Price was holding her weapon pointed upwards. Doc. 79-4 at 13. Ezekiel then fired his weapon, emptying the magazine. Docs. 79-4 at 14. Ezekiel recalls that the officer who broke the window was firing his weapon at the same time. Doc. 79-4 at 15.

When Mims arrived, she parked her vehicle behind Nunn, who was parked directly behind Price. Doc. 79-3 at 11. She saw Bone get out of his vehicle and lay down on the hood of Price's car. Doc. 79-3 at 12. She eased up to Price's passenger side window. Doc. 79-3 at 12. Mims gave Price commands to keep her hands up, but she did not have a bull horn or loud speaker. Doc. 79-3 at 12. She watched as Reeves broke the window, and saw Price point the gun in the direction of the window. Doc. 79-3 at 12–13. Mims began yelling, "Jason, gun! Jason, gun!" Doc. 79-3 at 13. She saw Price lean over, then she saw a flash, and the trunk window shattered in her face. Doc. 79-3 at 13. Mims thought that Price had fired a weapon at her, so she began to shoot back. Doc. 79-3 at 13. Mims heard Reeves fire his gun. Doc. 79-3 at 13. When Mims realized that there was another officer on the other side of the vehicle, she dropped her weapon, took cover beside Nunn's vehicle, and called on the radio, "Shots fired." Doc. 79-3 at 13. The last shot was fired around 26

seconds after Price parked her vehicle. Doc. 79-1 at 47:59–48:26. Price was fatally wounded in the shooting. Doc. 89-1 at 231.

## IV. DISCUSSION

### A.    Fourth Amendment Violation

The Fourth Amendment to the United States Constitution ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This case is about whether Price's right to be free from unreasonable seizure was violated by the Defendants' use of excessive and deadly force. "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S 386, 394. "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." *Id.* Chappell contends that Price's right to be free from unlawful seizure was violated by the use of excessive and deadly force. Doc. 1 at 12. The Supreme Court has held that all claims that law enforcement officers used excessive force in the course of a seizure should be analyzed under the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 395. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal citations and quotations omitted). "[P]roper application requires careful attention to the facts and circumstances of each particular case,

including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the other officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

Defendants will be entitled to qualified immunity if their conduct does not violate "clearly established or constitutional rights of which a reasonable person would have known," *Hope v. Pelzer*, U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), and they were acting within their discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities. *Id.* Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee*, 284 F.3d at 1194. Discretionary authority encompasses those acts that fall within an employee's job responsibilities. *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Defendants here were acting within the course and scope of their discretionary authority during the pursuit and when the shooting occurred. *See Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

"The burden then shifts to [Price] to show that qualified immunity should not apply because: (1) the officers violated a constitutional right, and (2) that right was clearly established at the time of the incident." *Garczynski*, 573 F.3d at 1166. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). Courts have the discretion to determine the order in which to address the prongs of this test. *Garczynski*, 573 F.3d at 1166 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). This court will analyze the second prong first.

### 1. Whether the Right Was Clearly Established

The salient question is whether the state of the law in 2015 gave Mims, Reeves, and Ezekiel fair warning that their actions violated Price's Fourth Amendment rights. *See Hope v. Pelzer*, 536 U.S. 730, 742 (2002). While "[e]xact factual identity with a previously decided case is not required . . . the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011); *see also Hope*, 536 U.S. at 739 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."). "In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Lee v. Ferraro*, 284 F.3d 1188, 1197 n. 5 (11th Cir. 2002) (internal citation

and quotation marks omitted). "Pointing to law pre-existing the events in the pertinent case, [Plaintiff has] the burden of demonstrating that Defendants—at the pertinent time and given the specific circumstances of this case—had fair notice that their conduct would violate clear federal law." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007). "To demonstrate that the law at the time clearly established that Defendants' conduct would violate the Constitution, Plaintiffs might point to either (1) earlier case law from the Supreme Court, [the Eleventh Circuit Court of Appeals], or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of Defendants' conduct." *Id.* "This analysis must be undertaken in the specific crucible of the case, and not as a broad general proposition." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). It requires the courts to "slosh our way through the factbound morass of reasonableness." *Scott v. Harris*, 550 U.S. 372, 383 (2007). Ultimately, this is the plaintiff's burden to bear, and it is a burden Chappell has failed to meet.

### a. The Applicable Time Frame

Despite Chappell's contention, the court is not required to limit its analysis to the 19 seconds immediately preceding the shooting. In an effort to persuade the court to narrow its review of the record, Chappell points to *Knight through Kerr v. Miami-Dade County*, 856 F.3d 795 (11th Cir. 2017). In *Knight*, police officers pursued the suspect's vehicle for more than half of a mile before the vehicle came to a stop at a dead-end. After

stopping, the officers turned on their spotlight, exited their car with guns drawn, and commanded the suspects to exit their car. *Id.* Two minutes elapsed between this moment and the first shot that was fired. *Id.* Although some of the events occurring in those two minutes were disputed, the parties agreed that, at some point, the suspect reversed his vehicle and almost hit an officer, and that the officers fired their guns, killing two of the vehicle's passengers. *Id.*

The plaintiffs argued that the circumstances of the car chase were relevant, because the officers allegedly violated their own pursuit policy, leading to an excessive seizure. *Id.* However, they acknowledged that no Fourth Amendment violation could be found on the pursuit policy alone. *Id.* After carefully considering the temporal separation between the pursuit-policy violation and the shooting, and not wanting to mislead the jury, the trial court determined that the only relevant facts occurred after the cars stopped in the dead-end. *Id.* at 813–14. The Eleventh Circuit affirmed, finding that "[t]his was a careful, fact-bound decision" that did not amount to an abuse of discretion. *Id.* at 814. The court noted that in qualified immunity cases, "we analyze the precise circumstances immediately preceding the victim's being shot rather than the more-attenuated events that occurred before and after the shooting." *Id.* (internal quotation and citation omitted). Thus, the court found that it was within the trial court's discretion to conclude that the alleged pursuit-policy violation was irrelevant. *Id.* The Eleventh Circuit did not conclude that the trial court must have limited its analysis to the two minutes immediately preceding the shooting, but determined only that the trial court had the discretion to decide whether to narrow its review. *Id.* Nothing in *Knight* mandates that this court may only consider the 90 seconds

immediately preceding Price's death. And, to the contrary, other courts performing a qualified immunity analysis in car chase cases often have considered the entirety of the pursuit.

For example, in *Mullenix v. Luna*, 136 S. Ct. 305 (2015), the Supreme Court considered all the circumstances of an 18-minute car chase when determining whether to grant qualified immunity. In that case, officers attempted to arrest the suspect at a drive-in restaurant. *Id.* at 306. When they told him that he was under arrest, he sped off in his car, heading for the interstate. *Id.* The officers followed him and were joined in pursuit by other law enforcement officers. *Id.* The suspect led the officers on an 18-minute chase down the interstate at speeds of 85 to 110 miles per hour. *Id.* During the chase, the suspect called dispatch, claimed to have a gun, and threatened to shoot the officers if they did not abandon the pursuit. *Id.* The officers also were concerned that he was intoxicated. *Id.* They put down spike strips in various locations but one officer attempted to disable the vehicle by shooting it with a rifle. *Id.* However, the officer fatally shot the driver, not his vehicle. *Id.* at 307. The court determined that the relevant inquiry was whether this officer acted reasonably when he "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering" another officer. *Id.* at 309. The court did not limit analysis to the seconds immediately preceding the shooting, or to what the decedent did with his weapon immediately before being shot.

Similarly, in *Pace v. Capobianco*, 283 F.3d 1275, 1280 (11th Cir. 2002), the court determined that the details of an entire car chase were relevant to a qualified immunity

analysis. The plaintiff, Alfaigo Davis, was pulled over for driving without headlights. *Id.* at 1276. After giving a false name and social security number to the deputy, he was ordered to get out of his car. *Id.* at 1277. He did so, but a struggle then ensued, in which Davis broke away, ran around a house, returned to his car, and started the engine. *Id.* Davis' window was open, and the deputy managed to pepper spray his face. *Id.* Undeterred, he drove off. *Id.* The deputy radioed for assistance and other law enforcement officers joined in the high-speed chase. *Id.* Davis drove his car dangerously, swerving in front of oncoming traffic, making an abrupt left turn, driving through the yard of a home, and almost striking another motorist when driving on the wrong side of the road. *Id.* After 15 minutes of pursuit, Davis stopped in a dead-end cul-de-sac. *Id.* One deputy parked on his left, one deputy parked on his right, and two stopped their cars behind him. *Id.* Davis was ordered out of his car, but he did not immediately comply with that command. *Id.* at 1278. Within a few seconds of stopping and ordering Davis out of the vehicle, a deputy positioned himself in front of Davis' car and fired two shots through the front windshield. *Id.* In determining whether qualified immunity was appropriate, the Eleventh Circuit relied on the entire interaction between Davis and the officers, including the lengthy, high-speed car chase. *Id.* at 1283. And, not only did the court not limit its analysis to the seconds immediately preceding the shooting, it disregarded testimony of an eyewitness who happened to be in the cul-de-sac because he did not know the full details of the car chase. *Id.* at 1283 & 1280.

### b.    Whether a Genuine Dispute of Material Fact Exists

Chappell appears to argue that there are three material facts in dispute: (1) what

Price did with her weapon in the 19 seconds before she was shot, (2) who fired the first shot, and (3) who removed Price's gun from the vehicle after the shooting.[2] Doc. 89 at 28–30. But Chappell admits that it is undisputed that Price had a revolver in the front seat of her car. Doc. 89 at 32. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.* "[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* A fact is material if its presence or absence will affect the outcome. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). None of the disputes of fact that Chappell identifies are material. Mims, Reeves, and Ezekiel are entitled to qualified immunity regardless of whether Price pointed her weapon directly at the officers, pointed the gun upwards, or did not fire the first shot. By the time the first shots were fired, all three defendants were aware that Price had a gun. Calera officers told Ezekiel that Price was armed, he thought he had seen Price stick her arm out of the car window while holding a firearm at Exit 228, and Ezekiel then heard Reeves yell, "Gun!" after shattering Price's window at Exit 212. Doc. 79-4 at 8, 9 & 13. While Reeves was working at the courthouse, he heard dispatch report that the suspect possibly had two firearms on her person, and then at Exit 212 he saw Price with a revolver in her hands. Doc. 79-2 at 6 & 9. At Exit 212, Mims also saw Price with a

---

[2] Both Reeves and another officer state that they removed the revolver from Price's vehicle after the shooting. Chappell, citing to Dr. Jon M. Shane's expert report, argues that this conflict "casts doubt on the integrity of the crime scene and the officers' account of the event." Doc. 89 at 28. This conjecture does not create a material dispute of fact.

firearm. Doc. 79-3 at 13.  And though Officer Bone, whose view of Price was somewhat obscured by the smoke coming from her vehicle, did not see a gun in her hand, he did hear Reeves yell, "Gun!" Doc. 79-6 at 7.  Regardless of whether Price had her gun aimed at the officers, at the roof of the car, or simply available for ready use, Defendants were not required to wait until the moment Price used her deadly weapon to stop her. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Regardless of whether [plaintiff] had drawn his gun, [plaintiff's] gun was available for ready use, and [the officer] was not required to wait and hope for the best.").  A dispute over which officer removed Price's weapon from the vehicle after the incident has no impact on the qualified immunity analysis when Chappell has admitted that Price was armed and that all of the officers knew she was armed. Doc. 89 at 27.  Because the resolution of these disputed facts does not affect the outcome of this suit, they are not material and will not preclude a finding of summary judgment.

### c. Qualified Immunity Analysis

No clearly established law alerted Defendants that their actions on the night of June 17, 2015 violated the Fourth Amendment.  It is Chappell's burden to point the court to clearly established law, but he has failed to do so. *See Long*, 508 F.3d at 584.  The court likewise is unaware of clearly established law that would have given Mims, Reeves, and Ezekiel fair notice that deadly force was inappropriate where Price flashed her weapon at law enforcement at Exit 228, brandished her weapon at Exit 212, led officers on a lengthy high-speed pursuit, refused to comply with the officers' commands, and may have threatened to kill her husband.  Moreover, the Eleventh Circuit has granted law

enforcement officers qualified immunity in cases with facts that are materially similar. *See Luna*, 136 S. Ct. 305, 310 (2015) ("The Court has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone be a basis for denying qualified immunity."); *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."); *Jean-Baptiste v. Guiterrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("[R]egardless of whether [the suspect] had draw his gun, [his] gun was available for ready use, and [law enforcement] was not required to wait and hope for the best.").

For example, in *Garczynski*, 573 F.3d 1158, the Eleventh Circuit granted qualified immunity where law enforcement officers used deadly force against a mentally unstable man who they knew to have a gun, who was not clearly visible in his vehicle, and who refused to comply with the officer's commands. On March 9, 2005, Garczynski gave his estranged wife an envelope, which she expected to contain divorce papers. *Id.* at 1161. Instead, she opened the envelope to find papers expressing Garczynski's intent to kill himself. *Id.* She immediately called him. Garczynski told her he had a gun and planned to kill himself, but would not reveal his location. *Id.* She then called 911. *Id.* Deputy Jonathan Wildlove responded to the call and drove to the wife's home. *Id.* Two other law enforcement officers also arrived at the home. *Id.* The wife told the officers that Garczynski had never been violent. *Id.* While the officers were at the home, Garczynski called his wife. *Id.* Using cell phone towers and clues from the noise in the background of the call, the officers were able to determine Garczynski's location, a beach where

Garczynski and his wife had their second date. *Id.* at 1162. Officers searched the area and located Garczynski, still talking to his wife on the phone, while other officers found his car. *Id.* at 1163. Wildlove instructed Garczynski's wife to coax him to his car, which she did successfully. *Id.* As Garczynski turned on his car, the two continued to talk. *Id.* Eventually, his wife thought she heard someone over the phone shout, "Police!" In response, Garczynski asked his wife, "You called the cops on me?" *Id.* Officers had approached the car and instructed Garczynski to show his hands. *Id.* He did not comply, but kept his right hand hidden and leaned forwards. *Id.* Unable to open the passenger door, one of the officers smashed the front passenger-side window. *Id.* Another officer smashed the back passenger-side window. *Id.* At this point, Garczynski raised a gun to his head. *Id.* The officers continued to give Garczynski commands, pointing their guns at him and instructing him to put the gun down. *Id.* Instead, Garczynski pointed his gun at one of the law enforcement officers. *Id.* at 1164. Officers started shooting and fatally wounded Garczynski. *Id.*

The Eleventh Circuit granted qualified immunity, determining that the officers reasonably believed that Garczynski posed an immediate risk of serious harm to them. *Id.* at 1169. The court emphasized that the officers did not have control over Garczynski and could not prevent him from firing his gun, that they could have reasonably believed the weapon was loaded given Garczynski's intent to commit suicide, and that Garczynski refused to comply with their orders. *Id.* The court further opined that "[e]ven if we assumed that Garczynski did not point his gun in the officers' direction, the fact that Garczynski did not comply with the officers' repeated commands to drop his gun justified the use of deadly

force under these particular circumstances." *Id.*

*Garczynski* is instructive here. Like in *Garczynski*, Mims, Reeves, and Ezekiel knew they were dealing with a person who was armed with a gun and who potentially was unstable since Price's husband had reported her threat to kill him. And, like in *Garczynski*, where the officers reasonably could have believed that the gun was loaded due to his stated intent to commit suicide, here, the officers could have reasonably believed that the gun was loaded due to Price's stated intent to inflict harm on her husband. Price also refused to comply with commands, Docs. 79-6 at 6 & 79-2 at 9—as did Garczynski, 573 F.3d at 1169—after which Ezekiel attempted to open her car door and then shattered her window, Doc. 79-2 at 9, just like the officers in *Garczynski*, 573 F.3d at 1163. Consistent with Eleventh Circuit law, this court concludes that these facts alone were sufficient for Mims, Reeves, and Ezekiel to determine that Price posed an immediate threat of serious harm— regardless of whether she pointed the gun at the officers, at the back of the vehicle, or towards the roof of the car. *See Garczynski,* 573 F.3d at 1169 ("Even if we assumed that Garczynski did not point his gun in the officers' direction, the fact that Garczynski did not comply with the officers' repeated commands to drop his gun justified the use of deadly force under these particular circumstances.").

This conclusion is further supported by *Pace v. Capobianco*, 283 F.3d at 1277. As referenced above, a man named Davis led law enforcement on a 15-minute high-speed car chase. During the pursuit, Davis drove his car dangerously, swerving in front of traffic and almost striking other motorists. *Id.* When he finally stopped his car upon coming to a dead end, Davis continued to refuse to comply with commands. *Id.* at 1278. Within a few

seconds of stopping, a deputy fired two gunshots through Davis' window, before any cooling time had passed for the officers in the hot pursuit. *Id.* The Eleventh Circuit found that the plaintiff failed to carry its burden on the clearly-established-law prong, reasoning that "Plaintiff has identified no case demonstrating a clearly established rule prohibiting police officers from using deadly force in circumstances like those in this case: a case, among other things, where the fleeing suspect appeared to be dangerous by virtue of his hazardous driving during the long, nighttime car chase and where the suspect remained in his automobile with the engine running, even when almost surrounded by officers and where—*IF* the chase had ended at all—it had ended (at most) a very few seconds before the officers fired." *Id.* at 1284.

Similarly, here, Price led officers on long, dangerous, nighttime car chase. Doc. 79-1. Price fled law enforcement for over 45 minutes, Doc. 79-1, more than triple the length of the car chase in *Pace*. 283 F.3d at 1277. Like Davis, Price was driving dangerously—stopping in the middle of interstate traffic, driving at speeds around 90 miles per hour, and continuing to drive with a punctured tire. Doc. 79-1. And, as in *Pace*, where it was unclear whether Davis had ended the chase when he stopped in the dead-end, here the officers had no way of knowing whether Price intended to put her car in gear and attempt to drive off again when she stopped on the exit ramp. Moreover, when Price did not stop, she did not comply with commands to show her hands, Docs. 79-6 at 6 & 79-2 at 9, just like Davis, who did not comply with the command to exit his vehicle. *Pace*, 283 F.3d at 1278. And, like in *Pace*, officers used deadly force within a matter of seconds of Price's finally stopping her vehicle, before any cooling off period occurred. Doc. 79-1 at 47:58–48:26.

The court finds that here, consistent with *Pace*, there is no preexisting case that would have placed reasonable officers on notice that their actions violated federal law.

As another example, in *Jean-Baptiste*, 627 F.3d at 821, the Eleventh Circuit determined that an officer's use of deadly force was objectively reasonable where he knew that the suspect had a gun available for ready use. Officer Jose Gutierrez had received a report that two armed burglary suspects were driving a red Dodge car. *Id.* at 818. The officer later observed a red Dodge speeding and then saw the car run a red light, at which point he activated his blue lights and began following the car. *Id.* The Dodge drove away from the officer at a high rate of speed until it crashed into a wall. *Id.* By the time the officer reached the car, the two suspects had fled on foot. *Id.* But the two suspects encountered other officers and were forced to return down the same street. *Id.* When Gutierrez saw the suspects, he saw that one of them was holding an object that looked like a gun. *Id.* at 819. Gutierrez chased them behind a house where one of the suspects jumped a fence. *Id.* Gutierrez saw a shed on his left, and when he turned to face the shed, he saw the other suspect holding a gun. *Id.* He began to fire. *Id.* The parties did not dispute that the suspect was armed and that Gutierrez had fired without warning. *Id.* But they did not agree as to what the suspect did with his weapon. *Id.* Gutierrez claimed that the suspect pointed the gun at him, while the suspect claimed that he did not point his gun in Gutierrez's direction or signal that he was going to shoot. *Id.* The Eleventh Circuit determined that Gutierrez was entitled to qualified immunity, regardless of whether the suspect had drawn his gun or simply had it ready for use. *Id.* at 821–22.

Similarly, the Defendants here are entitled to qualified immunity, regardless of

whether Price had her gun drawn and directly aimed at law enforcement, or simply readily available. Like in *Jean-Baptiste*, where the suspects led officers on a high-speed car chase, Chappell attempted to elude officers and led them on a lengthy, high-speed car chase. Doc. 79-1. And, as in *Jean-Baptiste*, where the officer knew that the suspects were armed based on personal observation and dispatch reports, Mims, Reeves, and Ezekiel were all aware that Price was armed, either from their own personal observations or from hearing dispatch reports. The court finds that, as in *Jean-Baptiste*, Defendants are entitled to qualified immunity for using deadly force where they knew that Price's weapon was readily available to her.

Accordingly, because Chappell has not presented any clearly established law that would have alerted reasonable officers that their actions violated the Fourth Amendment, Mims, Reeves, and Ezekiel are entitled to qualified immunity.

**B.    Motion to Exclude Testimony of Plaintiff's Expert Witness**

Defendants move to exclude the testimony of Plaintiff's expert Jon M. Shane. Doc. 82. Dr. Jon Shane was "retained by plaintiff to utilize his education, training, experience, and expertise to develop an expert opinion as to whether, given the facts as they are known and the circumstances, the amount of force used by defendants was reasonable and consistent with accepted police policies and practices." Doc. 90 at 2. Chappell proffers that, at trial, Shane would testify that Mims, Reeves, and Ezekiel violated national and local agency guidelines for using deadly force when they shot Price without facing an imminent threat. Doc. 90 at 2–3. Shane also is expected to testify that Defendants failed to apply high-risk traffic stop tactics at Exit 228, and that the totality of the circumstances

surrounding the events does not weigh in favor of using deadly force to the exclusion of alternative methods. Doc. 90 at 2–3. In his deposition, he also testified that mere possession of a gun does not permit deadly force, unless there are facts establishing that the subject posed an immediately deadly threat. Doc. 82-2 at 24. He further testified that Defendants would have been justified in using deadly force if Price pointed her gun in their general direction. Doc. 82-2 at 24. Ultimately, Shane is offering an opinion as to whether a constitutional violation occurred, and whether Defendants violated local and national policies. He is not an offering an opinion about whether clearly established law put Defendants on notice that their conduct was unconstitutional. Because that is the question upon which the court's analysis turns, the court did not rely on Shane's testimony in its qualified immunity analysis. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). Accordingly, the Motion to Exclude Testimony of Plaintiff's Expert (Doc. 82) is DENIED as moot.[3]

## C. State-Law Claims

Pursuant to 28 U.S.C. § 1367(c)(3), the court declines to exercise supplemental jurisdiction over Chappell's remaining state-law claims for wrongful death because his

---

[3] Even if the court had considered Shane's testimony, it is unlikely that his expert report would have impacted the resolution of the pending motion for summary judgment. "[P]laintiffs cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Knight*, 856 F.3d at 813–14 (internal citation and quotation omitted). "Indeed, so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot succeed by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *Id.*

federal law claims are due to be dismissed. *See* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction"). Where all federal claims are dismissed prior to trial, district courts are encouraged to dismiss remaining state-law claims. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine  . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Before dismissing the remaining state-law claims, courts consider the factors of judicial economy, convenience, fairness, and comity. *See Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015) (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).

"Both comity and economy are served when issues of state law are resolved by state courts." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002). "Federal courts are (and should be) loath to wade into uncharted waters of state law, and should only do so when absolutely necessary to the disposition of a case." *Ameritox*, 803 F.3d at 540. Indeed, the Supreme Court has declared that "[n]eedless decisions of state law should be avoided as a matter of comity and to promote justice between the parties, by procuring them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 282 U.S. 715, 726 (1966). The court sees no reason to depart from this rule of thumb by adjudicating Chappell's state-law claims if his federal claims are dismissed. Further, there is nothing before the court to suggest that the remaining factors—convenience and fairness—weigh

in favor of retaining subject-matter jurisdiction, and the court can discern no possibility of significant prejudice to any party. Accordingly, pursuant to § 1367(c)(3), the court will decline to exercise supplemental jurisdiction of Chappell's wrongful death claims.

## V. CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' Motion to Exclude Testimony (Doc. 82) is DENIED as moot. It is further ORDERED that the Motions for Summary Judgment (Docs. 77 & 78) are GRANTED, and that all federal claims in this action are DISMISSED with prejudice and the state-law claims are DISMISSED without prejudice.

DONE this 7th day of June, 2019.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE